IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH (832) 290-7035 THAT IS STORED AT PREMISES CONTROLLED BY APPSVERSE, INC. | Case No. _____ <br> 7:23-mj-145 |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Daniel S. Lang, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for information associated with phone number (832) 290-7035 that is stored at premises owned, maintained, controlled, or operated by Appsverse, Inc., ("Appsverse") a wireless provider headquartered at 5255 Stevens Creek Rd. Suite 398 Santa Clara, California 95051-6664.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(a), (b)(1)(A), and (c)(1)(A) to require Appsverse to disclose to the government records and other information in its possession pertaining to the subscriber or customer associated with the accounts, including the contents of communications.

2.      I am a Criminal Investigator Deputy United States Marshal (CIDUSM) with the United States Marshals Service (USMS) and have been since October 17, 2016.  I am currently assigned as the District Sex Offender Coordinator (DSOC) for the Western District of Virginia in Roanoke, Virginia.  In accordance with the performance of my duties, I am assigned to locate and apprehend federal, state, and local fugitives, conduct criminal investigations, and make arrests in

accordance with the same.  My primary responsibility as the DSOC is to investigate crimes involving individuals that are convicted sex offenders and who have failed to register as required by the Sex Offender Registration and Notification Act ("SORNA") (codified at Title 42, United States Code, Section 16901, et seq.), enacted on July 27, 2006, as part of the Adam Walsh Child Protection Act of 2006.  Prior to my employment with the USMS, I was employed for six years as a Special Agent with the U.S. Department of Health and Human Services, Office of the Inspector General (HHS-OIG), and two years as a Uniformed Officer with U.S. Customs and Border Protection (CBP).  I am a graduate of the Basic Deputy U.S. Marshal Training Academy, the Sex Offender Investigations Coordinator Basic Course, the Criminal Investigator Training Program, the HHS-OIG Special Agent Basic Training Program, the CBP Integrated Training Program, and numerous mission-specific training courses.

3.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 2250(a) have been committed by Janike Dunbar HOLT.  There is also probable cause to believe that HOLT has committed identity theft, in violation of 18 U.S.C. § 1028(a)(7).  There is also probable cause to search the information described in Attachment A for the evidence of these crimes further described in Attachment B.

## JURISDICTION

5.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. § 2703(a), (b)(1)(A), &

2

(c)(1)(A).  Specifically, the Court is a "district court of the United States (including a magistrate judge of such a court) . . . that . . . has jurisdiction over the offense being investigated. 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

6.      On March 14, 2023, Janike Dunbar HOLT was arrested by personnel from the U.S. Marshals Capital Area Regional Fugitive Task Force in Roanoke, Virginia.  HOLT was wanted by the Alamance County Sheriff's Office in North Carolina for failing to report a change of address despite being registered as a sex offender, in violation of North Carolina Statute 14-208.11(A)(2).

7.      HOLT is a sex offender from North Carolina who, at the time of his arrest, was not registered as a sex offender in the Commonwealth of Virginia, as required by law.  On August 1, 2018, HOLT was convicted of Indecent Liberties with a Child in violation of North Carolina Statute 14-202.1.  As a result of this conviction, HOLT was sentenced to 14-26 months in the North Carolina Department of Adult Correction and required to register as a sex offender in the State of North Carolina for not less than 10 years beginning on October 11, 2018.  On March 27, 2023, the Virginia State Police ("VSP") Sex Offender Registry conducted an official inquiry to determine whether HOLT had registered as a sex offender in the Commonwealth of Virginia.  On April 3, 2023, VSP informed me that based off of HOLT's North Carolina conviction, he would be required to register as a sex offender in the Commonwealth of Virginia.  Further, VSP found that no Initial Sex Offender Registration form had been received regarding HOLT.

8.      On October 11, 2018, HOLT completed his initial sex offender registration with the Alamance County Sheriff's Office.  As a part of this sex offender registration process, HOLT acknowledged his "Duty to Register" requirements both by signature and by affixing his initials.  HOLT signed and initialed these forms indicating his understanding of the Sex Offender

3

Registration process, which included numerous provisions.  Specific to this investigation, HOLT acknowledged the following three sections:

a.  (11) MOVING OUT-OF-STATE

    i.   If I change residence or establish another address in another state, I must report the new address to the last registering county sheriff.

    ii.   Such notification shall be made <u>IN-PERSON</u> and must occur at least three (3) business days prior to the date I intend to move out of North Carolina.  I will identity the state and provide the new address, telephone number and any contact information.

    iii.   I understand that if the new state requires registration, I must register with the designated law enforcement agency of the new state.  I will comply with any registration requirements in the new state of residence to which I move, obtain employment or attend school.  If I have questions, I will contact the nearest law enforcement agency to my new location.

    iv.   I understand North Carolina may forward my information to the gaining state.

    v.   If I indicated my intent to reside in another state or jurisdiction and later decide to remain in North Carolina, I shall within three (3) business days after the date upon which I indicated I would leave North Carolina, report <u>IN-PERSON</u> to the county sheriff's office to which I reported the intended change of residence of my intent to remain here.

4

b.  (12) VISITING OR ENTERING ANOTHER STATE TERRITORY OR JURISDICTION:

    i.  I understand that each state has its own registration laws.

    ii.  I understand I may have an obligation to register in other states I enter.

    iii.  I understand it is my obligation to know the law of each state I enter.

    iv.  I should contact each state before entering to ensure compliance.

c.  (13) OUT OF COUNTY EMPLOYMENT/RESIDENCY

    i.  I understand I should notify the sheriff of my county of registration when I will be working or residing outside of that county for more than ten (10) days in a 30-day period for an aggregate (total) period of 30 days in a calendar year.

9.  According to HOLT's sex offender registration records provided by the Alamance County Sheriff's Office, HOLT checked in or updated his information with the Alamance County Sheriff's Office monthly between April of 2022 and January of 2023.  HOLT's last check-in with the Alamance County Sheriff's Office, prior to his arrest and extradition in March of 2023, occurred on January 11, 2023, and he provided an address of "Homeless."

10.  During the course of this investigation, information was provided to USMS that indicated that HOLT had been residing in Roanoke, Virginia, in the Western District of Virginia, from at least February of 2023 until his arrest (further described below) on March 14, 2023. Specifically, interviews were conducted with three individuals (B.L., J.L., and S.M.) in Roanoke who had personal relationships with HOLT.  Both B.L. and J.L. stated that they physically saw HOLT in Roanoke for the first time on or about February 6, 2023.  S.M. stated that she physically saw HOLT in Roanoke for the first time on or about February 10, 2023.  Further, S.M. stated that

5

between around February 14, 2023, and March 14, 2023, she was unaware of HOLT ever having left the Roanoke metro area and that HOLT only spent one night away from her during the timeframe stated above. During this timeframe, S.M. stated that HOLT was residing with her at 1805 Liberty Rd. NW in Roanoke.

11.     Following his arrest, HOLT was interviewed at the Roanoke City Adult Detention Center by me and by VSP Trooper Lisa Williams. HOLT was advised of his Miranda rights and waived his rights. During this in-custody interview, HOLT admitted that he had been spending time in Roanoke, Virginia, but stated that he had been commuting between Burlington, North Carolina, and Roanoke every few days and was not staying in Roanoke on a consistent basis. During the interview, HOLT told Trooper Williams and me that his cell phone number is (336) 447-0697.

12.     On July 19, 2023, United States District Judge Robert S. Ballou authorized a search warrant (7:23-MJ-87) to collect information from Verizon Wireless associated with this (336) 447-0697 phone number, including historical cell site data. After I executed this search warrant, Verizon Wireless provided historical cell site data reflecting that the (336) 447-0697 phone number pinged cell-sites in in the Roanoke metro area—and only in the Roanoke metro area—beginning on February 6, 2023, and continuing until HOLT's March 14, 2023 arrest.

13.     The (336) 447-0697 phone number was also listed as being associated with HOLT on a March 16, 2023, Roanoke City Police Department Report (23-024598) which was taken relating to a call for service involving a fraud investigation. Specifically, in the narrative of this report, the reporting officer, Ofc. S.B. Frossell, lists the "Suspect" as Janike Dunbar HOLT and placed the phone number (336) 447-0697 next to HOLT's name. The complainants in the report, B.L. and J.L., stated that HOLT scammed them out of $1,020. They further stated that HOLT had

moved to Roanoke, on February 6, 2023, and had stayed at their home located at 1002 Lafayette Blvd. NW in Roanoke.  While staying with B.L. and J.L., HOLT attempted to provide them with a check for $75,000 that he claimed was part of a payment for being falsely accused in his case in North Carolina.  Lastly, the report makes mention of B.L. and J.L. receiving text messages from individuals claiming to be affiliated with baseball teams that were purportedly recruiting HOLT to play for them.  These messages related to B.L. and J.L. selling their homes and traveling with HOLT for his baseball career.  According to the report, B.L. and J.L. were suspicious of the check HOLT provided, as well as the circumstances surrounding his alleged baseball career.  They subsequently filed this report with the Roanoke City Police Department after HOLT was arrested.

14.     One of the individuals who was reaching out to B.L. and J.L. claimed to be Dusty Baker, the Manager of the Houston Astros Major League Baseball organization.  I am aware that Dusty Baker was the Manager of the Astros until fall 2023.  On March 23, 2023, I sent a letter to the Astros asking whether they had had any correspondence with HOLT.  On March 29, 2023, an individual from the Astros responded to me that they had conducted a search for records related to HOLT, and that the Astros have not entered into any type of contractual relationship with HOLT, and they have no record of him.

15.     On August 10, 2023, B.L. allowed me to take photographs of text messages she received, including from the individual claiming to be Dusty Baker.  In summary, these messages indicated that HOLT would purportedly be signing a Major League Baseball contract with the Astros on March 30, 2023.  These messages also indicated that B.L.'s family would be moving to Houston, Texas, with HOLT to serve as his managers.  Contained within the messages was additional text indicating that the Astros would provide B.L. and her family homes, transportation to Texas, and a $5.5 million check upon HOLT signing his Major League Baseball contract.

7

16.     On September 6, 2023, B.L. provided me with the phone number associated with the text messages from the individual claiming to be Dusty Baker.  This phone number was (832) 290-7035.

17.     On September 11, 2023, I contacted Bandwidth, Inc. regarding phone number (832) 290-7035.  Bandwidth, Inc. informed me that Appsverse, Inc. is the cell phone provider for phone number (832) 290-7035.

18.     On September 22, 2023, I served a grand jury subpoena on Appsverse for subscriber information, billing information, and telephone toll records for (832) 290-7035.  On September 26, 2023, Appsverse provided records in response to the subpoena.  In doing so, Appsverse produced not only information responsive to the subpoena, but also substance of communications, which had not been requested.

19.     In consultation with the U.S. Attorney's Office, on November 8, 2023, I destroyed all copies of Appsverse's production, and the U.S. Attorney's Office did the same.  On November 9, 2023, the U.S. Attorney's Office alerted U.S. District Judge Elizabeth K. Dillon about Appsverse's overproduction of records.  None of the information in this affidavit is derived from the information that Appsverse provided in response to the September grand jury subpoena.

20.     On November 14, 2023, I served a Preservation Letter on Appsverse for records related to phone number (832) 290-7035 for the time period of March 6, 2023, to March 14, 2023. Receipt of this Preservation Letter was acknowledged by Appsverse on the same date.

21.     In my training and experience, I have learned that Appsverse is a company that provides cellular telephone access to the general public, and that stored electronic communications, including retrieved and unretrieved voicemail, text, and multimedia messages for Appsverse subscribers may be located on the computers of Appsverse.  Further, I am aware

8

that computers located at Appsverse may contain information and other stored electronic communications belonging to unrelated third parties.

22.     Wireless phone providers often provide their subscribers with voicemail services. In general, a provider will store voicemail messages on behalf of a particular subscriber until the subscriber deletes the voicemail.  If the subscriber does not delete the message, the message may remain in the system of Appsverse for weeks or months.

23.     Among the services commonly offered by wireless phone providers is the capacity to send short text or multimedia messages (photos, audio, or video) from one subscriber's phone or wireless device to another phone or wireless device via one or more wireless providers.  This service is often referred to as "Short Message Service" ("SMS") or "Multimedia Messaging Service" ("MMS"), and is often referred to generically as "text messaging." Based on my knowledge and experience, I believe that stored electronic communications, including SMS and MMS messages that have been sent or received by subscribers, may be stored by Appsverse for short periods incident to and following their transmission.  In addition, providers occasionally retain printouts from original storage of text messages for a particular subscriber's account.

24.     Wireless phone providers typically retain certain transactional information about the use of each telephone, voicemail, and text-messaging account on their systems.   This information can include log files and messaging logs showing all activity on the account, such as local and long distance telephone connection records, records of session times and durations, lists of all incoming and outgoing telephone numbers or e-mail addresses associated with particular telephone calls, voicemail messages, and text or multimedia messages.  Providers may also have information about the dates, times, and methods of connecting associated with every communication in which a particular cellular device was involved.

9

25.     Wireless providers may also retain text messaging logs that include specific information about text and multimedia messages sent or received from the account, such as the dates and times of the messages.  A provider may also retain information about which cellular handset or device was associated with the account when the messages were sent or received.  The provider could have this information because each cellular device has one or more unique identifiers embedded inside it. Depending upon the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Station Equipment Identity ("IMEI"). When a cellular device connects to a cellular antenna or tower, it reveals its embedded unique identifiers to the cellular antenna or tower in order to obtain service, and the cellular antenna or tower records those identifiers as a matter of course.

26.     Many wireless providers retain information about the location in which a particular communication was transmitted or received.  This information can include data about which "cell towers" (i.e., antenna towers covering specific geographic areas) received a radio signal from the cellular device and thereby transmitted or received the communication in question.

27.     Wireless providers also maintain business records and subscriber information for particular accounts.  This information could include the subscribers' full names and addresses, the address to which any equipment was shipped, the date on which the account was opened, the length of service, the types of service utilized, the ESN or other unique identifier for the cellular device associated with the account, the subscribers' Social Security Numbers and dates of birth, all telephone numbers and other identifiers associated with the account, and a description of the

10

services available to the account subscribers.  In addition, wireless providers typically generate and retain billing records for each account, which may show all billable calls (including outgoing digits dialed).  The providers may also have payment information for the account, including the dates, times and sometimes, places, of payments and the means and source of payment (including any credit card or bank account number).

28.    In some cases, wireless subscribers may communicate directly with a wireless provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users.  Wireless providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.

29.    As explained below, information stored at the wireless provider, including that described above, may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, the data pertaining to a particular cellular device that is retained by a wireless provider can indicate who has used or controlled the cellular device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, data collected at the time of account sign-up, information relating to account payments, and communications (and the data associated with the foregoing, such as date and time) may indicate who used or controlled a cellular device at a relevant time.  Further, such stored electronic data can show how and when the cellular device and associated cellular service were accessed or used.  Such "timeline" information allows investigators to understand the

11

chronological context of cellular device usage, account access, and events relating to the crime under investigation. This "timeline" information may tend to either inculpate or exculpate the cellular device owner. Additionally, information stored by the wireless provider may indicate the geographic location of the cellular device and user at a particular time (e.g., historic cell-site location information; location integrated into an image or video sent via text message to include both metadata and the physical location displayed in an image or video). Lastly, stored electronic data may provide relevant insight into the state of mind of the cellular device's owner and/or user as it relates to the offense under investigation. For example, information relating to the cellular device in the possession of the wireless provider may indicate the owner's motive and intent to commit a crime (e.g., communications relating to the crime), or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement).

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

30.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. § 2703(a), (b)(1)(A) and (c)(1)(A), by using the warrant to require Appsverse to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

31.     Based on the forgoing, I request that the Court issue the proposed search warrant.

32.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

33.     The government will execute this warrant by serving the warrant on Appsverse. Because the warrant will be served on Appsverse, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

Daniel S. Lang
Criminal Investigator Deputy U.S. Marshal
United States Marshals Service

Subscribed and sworn to before me on _____November 30_____, 2023

The Honorable C. Kailani Memmer
UNITED STATES MAGISTRATE JUDGE

13